**Arthur L. WINN, Jr., and Sadie N. Winn**

v.

**The UNITED STATES.**

No. 437–80T.

United States Claims Court.

Feb. 28, 1983.

¶ 1302[3]. Thus, it is concluded that plaintiff's argument in this regard is not well-founded.

James P. Parker, Washington, D.C., for plaintiff. Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., of counsel.

Ellen C. Specker, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

## OPINION

WIESE, Judge:

Plaintiff, Arthur L. Winn, Jr.,[1] is a practicing lawyer secondarily engaged in the commercial real estate development business. In this latter capacity, he had leased property to a corporation in which he was a 25 percent shareholder and, at a later date, also lent funds to this corporation in an effort to assure its survival. Upon the corporation's demise, the loans became uncollectible thus prompting the issue presented in this tax refund suit: whether plaintiff's loans represented debts created or acquired in connection with his real estate business or were, instead, sums that he had expended for the protection of his ownership interest in the corporation. The facts favor the latter conclusion; accordingly, no refund is due.

## FACTS

The events which give rise to this lawsuit begin with the interest of Anthony Winn (plaintiff's son) in starting his own radio station and his need, in the pursuit of that ambition, of the financial support of his father. From a market study he had undertaken, Anthony Winn had concluded that Rockland County, New York represented a prime location for the licensing of a new radio station—this because of its proximity to New York City and its forseeable emergence as a new suburban growth area.

It was at Anthony's request that plaintiff made a survey trip to Rockland County in 1960 for the purpose of finding a property that would meet the specific requirements of size, location and orientation necessary to accommodate the placement of radio broadcast towers. Although he already had a generally favorable impression of that area from earlier contacts occasioned by his law practice, a closehand look convinced Arthur Winn that Rockland County was indeed attractive—attractive not only as a location for a new radio station but also as an area in which to pursue the acquisition and development of commercial real estate. The economic potential of the area having been confirmed, the survey trip thus came to serve a dual purpose: land meeting the specifications for the radio towers was located; at the same time plaintiff also located, and contracted to purchase for his own business purposes, three adjacent acres of unimproved land (known as the "Fee" property) amenable to commercial development.

Steps to implement these dual interests were promptly taken. On November 3, 1960, the Winns' (father and son operating as a partnership) filed an application with the Federal Communications Commission (FCC) for a license to construct and operate a radio station in Nanuet, Rockland County, New York; on January 12, 1961, the Fee property was acquired by Arthur Winn for $27,000; on May 3, 1961, plaintiff leased the land for the placement of the radio towers (a five-acre tract herein referred to as the "Tower land"), and, on May 26, 1961, plaintiff purchased a second parcel of unimproved property situated approximately 200 yards west of the Fee property. This tract, consisting of five acres and herein referred to as Stark I, was also acquired with a view to its commercial development. Finally, on June 6, 1961, the FCC license application was amended to substitute a corporation, Rockland Radio Corporation ("RRC"), in place of the partnership. (The corporation

---

1. Sadie N. Winn, wife of Arthur L. Winn, Jr., is a named party only because she filed joint tax returns with her husband.

had been formed in order to facilitate the participation of local community representatives in the application process—an idea which the Winns' counsel had suggested might improve their chances of success before the FCC.)

The hearings before the FCC began one year later (May 1962) and in February 1964 an initial decision was reached in the corporation's favor. In the interim, plaintiff had acquired an additional two acres adjoining the Stark property ("Stark II"). All other activity, however, was left to await the outcome of the license application.

A final decision favorable to Rockland Radio Corporation was issued in September 1964. Upon this granting of the broadcasting license to Rockland Radio Corporation, plaintiff commenced the simultaneous clearing of the Tower land and the Fee property and soon thereafter was engaged in the planning and construction of a commercial building on the Fee property. This building, referred to as "Broadcast House", was designed with the unique needs of the radio station in mind[2] and, indeed, the corporation had committed itself to rent the second floor of the building even before construction was undertaken. Along with that understanding, it had also been agreed that the corporation would sublease the Tower property from plaintiff as well as lease an adjacent two-thirds acre of Fee property. All of these commitments were formalized in leases executed on June 18, 1965.

The planning and construction of Broadcast House extended from roughly September 1964 through mid-summer 1966. In that time, the corporation's stock was paid for[3] and the planning and preparation necessary to begin broadcasting operations was completed. In the day-to-day concerns of the corporation, plaintiff had no role; his responsibilities as secretary and treasurer involved essentially record keeping functions and no salary was paid to him for either position. However, as to other non-managerial considerations, plaintiff's role was critical: it was his personal guaranty that stood behind a promised bank loan to the corporation of $75,000; the same was also true with regard to an indebtedness of approximately $42,000 that the corporation assumed upon its purchase of broadcasting equipment.

The corporation went "on the air" in September 1965.[4] Difficulties set in immediately. Ground conductivity was found to be substantially lower than expected resulting in the transmission of a poor or inadequate signal to certain parts of the county. This signal difficulty caused cancellation of advertising contracts and made additional sales of such contracts virtually impossible. As a result, the corporation did not achieve its anticipated "break-even" point within the projected three-month period; rather, it continued to experience operating losses. Immediate steps were taken to correct the problem, including an authorized change in broadcast pattern, but business fortunes continued their downward direction. Indeed, though corporate management (Anthony Winn) remained ever hopeful of establishing Rockland Radio Corporation as a profitable broadcasting business, that goal was never to be realized. The corporation

2. Broadcast House was specifically designed and constructed as a radio broadcasting facility. It was a small two-story building of steel and concrete construction, containing 8,000 square feet plus a separate garage building. The building was planned for dramatic effect and as a "showpiece" to attract public attention; hence, it was an odd-shaped building—curved in front and coming to a point in the back—which resembled a fourth of a piece of pie. The only doors and windows on the first floor were on the front facade; there were no rear or side doors or windows.

3. The corporation had been authorized to issue 240 shares of no-par common stock. The subscription price was $100 per share. Plaintiff subscribed to 60 shares, his son Anthony to 120 shares and the remaining 60 shares were divided equally between two local participants. Plaintiff, in addition to paying for his own shares ($6,000) also lent Anthony the $12,000 necessary to satisfy his subscription commitment.

4. Broadcasting operations began prior to the completion of Broadcast House from a temporary studio located on the Stark tract.

lost money in each of the five years of its existence; financial problems finally forced the closing of operations on August 14, 1970.

From the outset of its difficulties in 1965, the corporation's continuing cash needs were met by unsecured loans extended by the taxpayer. Through 1970, the sum of these advancements came to $192,902. This amount, together with another $36,326 which the taxpayer had lent to the corporation prior to 1965 (for a total of $229,228) became uncollectible in 1975. The taxpayer now claims the whole amount as a business bad debt deduction on the theory that survival of the radio corporation was necessary in order to protect the flow of rental income upon which the economic viability of his real estate holdings depended.

## DISCUSSION

The analysis appropriate to this case begins with the conceptually parallel situation that was presented in *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). There, the taxpayer; a shareholder-employee of a closely-held construction company, had agreed to indemnify the company's surety for any losses suffered by the surety under performance bonds given in the company's behalf. A loss was experienced by the surety on its undertaking; taxpayer, in turn, indemnified the surety. The corporation's resulting indebtedness to the taxpayer became uncollectible when the corporation later went into receivership. The taxpayer claimed the indemnification loss as a business bad debt under §§ 166(a) and (d) of the Internal Revenue Code of 1954[5] and the implementing regulations § 1.166–5 and accordingly deducted it against ordinary income.

The Supreme Court rejected this tax treatment. The Court held, in essence, that, in order to satisfy the regulation's requirement for a "proximate" relationship between a business and a debt loss claimed attributable to it,[6] the taxpayer had to show that the "dominant motivation" for the undertaking out of which the loss arose was the furtherance of his interests as an employee (*i.e.*, his business interest) rather than his interests as a shareholder (*i.e.*, his investment interest). In explaining its adoption of this standard, the Court said:

> The dominant-motivation standard has the attribute of workability. It provides a guideline of certainty for the trier of fact. The trier then may compare the risk against the potential reward and

---

5. "§ 166. Bad debts
    (a) General rule.—
    (1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
    \*   \*   \*   \*   \*   \*
    (d) Nonbusiness debts.—
    (1) General rule.—In the case of a taxpayer other than a corporation—
    (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
    (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.
    (2) Nonbusiness debt defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—"
    "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
    (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

6. The pertinent Treasury Regulation on Income Tax, § 1.166–5 (1975), reads as follows:
    "§ 1.166–5 Nonbusiness debts.
    \*   \*   \*   \*   \*   \*
    (b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than—
    \*   \*   \*   \*   \*
    (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
    The question whether a debt is a nonbusiness debt is a question of fact in each particular case. \* \* \* For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. \* \* \*"

give proper emphasis to the objective rather than to the subjective. * * * [A]n employee-shareholder, in making or guaranteeing a loan to his corporation, usually acts with two motivations, the one to protect his investment and the other to protect his employment. By making the dominant motivation the measure, the logical tax consequence ensues and prevents the mere presence of a business motive, however small and however insignificant, from controlling the tax result at the taxpayer's convenience. * * * [*United States v. Generes,* 405 U.S. 93, 104, 92 S.Ct. 827, 833, 31 L.Ed.2d 62 (1972).]

The comparison of economic interests which the Court's analysis thus called for—on the one hand the employee's business interest in his salary (amounting to roughly $7,000 after tax); on the other hand, his initial investment interest as a shareholder ($38,900 augmented by loans in an unspecified amount)—made it self-evident that it was the protection of the taxpayer's investment interest that had provided the controlling incentive for his loans. In short, the indebtedness was not a business bad debt.

■ As was true of the taxpayer in *Generes,* the present plaintiff too exhibits the same duality of economic interests the protection of which can reasonably be expected to have prompted the loans now claimed as business bad debts. The taxpayer is in the real estate business (the Government concedes this much [7]); and, as the facts make plain, he also has an investment interest in Rockland Radio Corporation. That these twin concerns do not occur here, as they did in *Generes,* within the framework of the same corporation does not matter. What counts is whether they share a common economic bond such that loans extended in protective behalf of one interest may simultaneously serve the other. Where that linkage is shown—and here such a tie-in is the very foundation of plaintiff's argument— the question of dominant motivation cannot

be avoided. *See Hunsaker v. Commissioner,* 615 F.2d 1253, 1256 n. 3 (9th Cir.1980). The essential question, therefore, is whether the loans advanced by plaintiff centered on his investment interests in Rockland Radio Corporation or were focused instead upon his real estate interests. Cast in more objective terms, the issue is which interest represented the larger economic concern when measured in terms of dollars and cents.

■ A. To take up first plaintiff's investment interest in the radio corporation, we start from the proposition that the amount plaintiff had "at risk" in that company is not to be gauged simply by reference to the amount he had paid for his shares. Rather, the cataloging of values must also comprehend all commitments or undertakings on his part (in behalf of the corporation) through which he would be caused a loss or exposed to a liability in the event of the corporation's demise. It is the sum of amounts paid and liabilities to be incurred that is at once the measure of plaintiff's loss potential and the motivation for his loans to the corporation.

As to some of the values thus includable there can be little question. There would be included: paid-in capital of $18,000 (this includes Anthony Winn's capital contribution of $12,000 the funds for which had been supplied by plaintiff), a working capital loan of $36,326 advanced by plaintiff prior to the company's commencement of operations, $42,500 worth of equipment purchases the payment of which was guaranteed by plaintiff, and, also, a $75,000 bank loan that had been extended to the corporation in January 1965, the repayment of which plaintiff had also guaranteed.

■ To this point in the listing there can be little to dispute. Where the enumeration gets sticky is with the Government's position adding to plaintiff's investment interests the amounts which he had paid under the Tower land lease (amounting to $48,690.19 through May 1, 1965), as well as

---

7. Although the analysis in this case relies on the Government's concession placing plaintiff in the real estate business, that should not be taken to mean that the court would have reached a like determination on its own.

the concurrent taxes on that property (roughly $2,500 through May 1, 1965). Plaintiff opposes this "investment" characterization of the Tower land; his claim is that that property belongs with his business (*i.e.,* real estate) interests. We agree with the Government.

Plaintiff's real estate business involves the renting and/or developing of commercial properties. The Tower land had nothing to do with that purpose. From start to finish, transactions involving the Tower land were shaped always by concerns unique to the radio corporation. Notable in this connection are the following: (i) the selection of the property was determined by site characteristics required for radio transmission; (ii) the acquisition of the property (the lease) was dictated by FCC considerations (no license could be granted without it); (iii) the holding of the property was subject to the granting of the license (the lease preserved plaintiff's right to cancel should the radio license not be granted); (iv) the use of the property allowed plaintiff no development options (the lease restricted the land's use to the conduct of a radio business); and, finally, and most importantly, (v) the subleasing of the property accomplished nothing more than a pass-through of plaintiff's own leasing costs, without profit or add-on. Given these considerations, the court fails to see how plaintiff's involvement with the Tower land could be regarded as a part of his trade or business. Throughout the whole of his dealings with that property, the only interest served was that of the radio corporation.

Plaintiff maintains, however, that he had acquired the Tower land with a view to subleasing it at a profit and that the sublease was, in fact, a profit-directed venture undertaken pursuant to his real estate business. The proof of this point is difficult to discern. The minutes of the corporation reveal that from the outset (*i.e.,* when plaintiff first leased the Tower land in 1961) he had indicated his willingness to sublease that property to the radio station

for the same rental that he was obligated to pay and, along with this, to lease part of the adjacent Fee property (specifically mentioned then was one-third of an acre) for $1,000. Four years later, on June 18, 1965, after the radio station license had been granted, plaintiff subleased the Tower land (for which his own lease cost was then $16,000 annually) and simultaneously leased an adjacent section of Fee property (two-thirds of an acre rather than the one-third acre first discussed) for a total rental of $18,134.[8]

From this it appears to the court that the combined lease-sublease arrangement mirrors quite the same terms which plaintiff had initially put forth in 1961, namely, a pass-through of the Tower land costs and a $1,000 rental charge per one-third acre of Fee property. The only variance is the added amount of $134. However, as to this *de minimus* figure, it would surely strain good sense to regard it as support for plaintiff's contention claiming an "annual profit with respect to the Tower Property which would have compensated him for the entrepreneurial risk he took in leasing it."

But even if one should allow plaintiff the benefit of doubt on the point, there would still stand unexplained the fact that the sublease contemplated no "pay-back" of the more than $50,000 which plaintiff had spent in rental payments and taxes during the four years that he held the Tower land lease in his own name while awaiting the outcome of the FCC licensing proceedings. This fact, above all else, strips of all credence the argument that "Arthur Winn leased the [Tower] property with the hope and expectation of sub-leasing it to the radio corporation at a profit."

Taking all these factors into consideration, the court thinks it plain that Arthur Winn's interest in the Tower land stood apart from his real estate business: that property was leased, held, and subleased by him all with one concern in mind—to attend to the needs of the radio station. The sum of these activities constituted a constructive contribution to the radio corporation, hence,

---

**8.** In their briefs, the parties refer to the Tower land rental as being $18,560. The lease, however, identifies only one figure, namely, $18,-134.

an enhancement of his investment interest. It follows too that the obligation that remained with plaintiff under the Tower land lease (to pay the annual rent and property taxes should the sublessee fail to do so) was a contingent liability properly includable among the risk factors to be counted when weighing plaintiff's investment-related stake in the radio corporation.

Adding it all up, the loss potential identifiable with plaintiff's investment in Rockland Radio Corporation, measured as of the time (December 1965) when operating losses first indicated the need for additional funds to bolster the company's chances for survival, comes to $394,816.91.[9]

B. As to the value assignable to plaintiff's business interest, here too there is disagreement between the parties. Plaintiff maintains that, for the comparison between investment and business interests to have validity, the value of the business interest should be expressed as a capitalized rental income figure ("over $600,000" is the amount plaintiff gives [10]) or, if not that, then in terms of the total capital committed to his Rockland County real estate ("almost $400,000" is the amount stated [11]). The Government argues that plaintiff's business interest should be measured either by reference to the amount of lease income actually received from the corporation (less fixed expenses) or, by reference to the anticipated lease income (again, less fixed expenses). Going by the Government's standards of measurement, there would either be no protectable business interest or, at best, a *de minimus* one.[12]

These positions do not merit acceptance. The difficulty with plaintiff's capitalization

---

9. The figure given in the text is based on the following amounts:

A. Cash Items

| | |
|---|---|
| Paid-in capital contribution | $ 6,000.00 |
| Loan to son to enable him to meet capital contribution | $ 12,000.00 |
| Tower Land lease payments | |
|   Rental payments (5/1/61 – 5/1/65) | $ 48,690.19 |
|   Property taxes (5/1/61 – 5/1/65) | $ 2,500.00 |
| Loan to corporation (1964) | $ 36,326.49 |
| Sub-Total | $105,516.68 |

B. Contingent Liabilities

| | |
|---|---|
| Bankers Trust Company; loan of January 1965, repayment guaranteed by plaintiff | $ 75,000.00 |
| Gates Radio Corporation: equipment purchases — payment guaranteed by plaintiff | $ 42,500.00 |
| Tower Land Lease: continuing liability through remaining 16 years for annual rental payments of $16,000 and annual property tax payments of $1,000 — | |
| Present value (at 6%) of total rental obligation | $161,694.33 |
| Present value (at 6%) of total tax obligation | $ 10,105.90 |
| Sub-Total | $289,300.23 |
| Grand Total | $394,816.91 |

10. Plaintiff appears to use the term "capitalized" value to denote that sum of money which, when invested at 6 percent (the going rate of interest during the period in question) would yield the projected annual rental income from the radio corporation of $37,000. Aside from the general disapproval with this approach that we go on to note in the text, the court also disagrees with plaintiff's earmarking of the entirety of the Tower land sublease payments ($18,134) as income attributable to his business interest. Only that part of this rent ascribable to the two-thirds acre of Fee property ($2,134) belongs under the "business interest" heading; the rest ($16,000) simply covers the costs of the lease commitment on the Tower land that he entered into for and in behalf of the radio corporation.

11. The "almost $400,000" figure apparently includes the total cost for the construction of Broadcast House ($224,150), the purchase price of the Fee property ($27,000), and the purchase price for the Stark tracts ($130,000). The exact sum of these amounts is $381,150.

12. From 1964 through 1968, plaintiff received only two rental payments from the corporation. In 1965, the corporation made a $14,000 payment under the Tower land sublease (whereas plaintiff's own expenses for that same property in that year came to $15,570); in 1967 it made a single month's payment of $1,541.67 under the lease for the second floor of Broadcast House (whereas plaintiff's 1967 interest costs alone for that same property came to $10,278.18). From these deficit values the Government concludes that plaintiff could have had no reasonable business income expectancy. Alternatively, the Government argues that if plaintiff's income expectations could be regarded as justifiable, then his business interest would amount to the profit he anticipated making from his radio corporation rents, *i.e.,* roughly $4,000.

argument is obvious: nothing in the facts would permit the court to endorse so distinctly hypothetical a value as the equivalent of the sum of a flow of future income from a company whose viability stood in doubt from the very start. Indeed, if that sort of value projection were permissible then it would be no less in order for the Government to speculate, over the same period of years, a corresponding enhancement in the value of plaintiff's investment interest in the radio corporation. Indulgence of this sort would quickly rob the dominant motivation standard of the very objectivity it was intended to foster.

Equally unacceptable are the yardsticks which the Government would apply. As has been noted, the Government's position is that the measure of plaintiff's business interest is the expected net rental income from the radio corporation, this to be expressed in terms of either (i) the annual rent that was actually received less fixed expenses, or, (ii) the annual rent that had been anticipated less fixed expenses.

The position is subject to two criticisms. The immediate objection goes to the fact that the rental payments represented the cash flow upon which the financing of plaintiff's real estate undertakings were, in part, dependent; consequently, it would be the entirety of such payments that mattered rather than just the profit element identifiable in them.

A related but more fundamental objection to the use of rental income as the gauge of plaintiff's business interest is that it defines the wrong risk. The real business interest at stake in this situation was not the annual rental payment due from the radio corporation. Rather, it was the value of the real estate holdings that generated the rental income that provided the true measure of plaintiff's business risk and thus of his loan motivation.

This realignment of risk from income value to asset value is explainable on two grounds. First, as already stated, rental income from the radio corporation was intended to cover, in part, plaintiff's own corresponding purchase obligations on the property involved (*i.e.,* the Fee property and Broadcast House); second, that property, as developed, lacked general commercial attractiveness; it was best suited for operation as a radio station. Thus, from both a financing and marketing standpoint, the viability of plaintiff's real estate holdings was tied to the viability of a radio station tenant. And because of this economic tie-in then, a demise of the radio business implied something more than just a loss of rental income; it simultaneously threatened plaintiff's ownership of the rental property.

■ The court agrees therefore that the Government's crimped view of the business interest at stake here does not fit with the immediate risks presented in the situation and is for that reason wrong. By the same token, however, we do not accept plaintiff's argument that his business interest should be measured by the total capital committed to that business. What this position presupposes is that the loss upon foreclosure, say, of Broadcast House, would extend beyond the equity in that property and the underlying realty. However, there is no proof in this case that the mortgagee had the right, following foreclosure, to seek satisfaction of any remaining indebtedness by proceeding against plaintiff's other properties or against him personally. We cannot bridge that gap by assumption because, as the court understands it, it is not unusual real estate financing to be nonrecourse in nature thereby compelling the lender to look only to the property as his security.[13] Accordingly, we see the amount at stake in

---

13. One authority on the subject explains that "[i]t is not unusual for the mortgage to contain express provisions relieving the maker of all personal liability, and the effect is to confine enforcement of the mortgage to the property described." C. Pindar, *American Real Estate Law* § 20–29 (1976 & Supp.1981). The same thought also appears in P. Goldstein, *Real Es-* *tate Transactions* 523 (1980), where the author, in discussing the indebtedness against a property as being included in its basis for depreciation, makes the point that "[t]his rule is particularly congenial to the real estate market where so much financing is nonrecourse, the lender looking only to the property for security."

plaintiff's business interest as being no greater than his equity in the Fee property and Broadcast House. And that figure, according to plaintiff's own past estimates of it, stood at $180,000 in 1968. For present purposes, we accept that figure at face value and assume his equity would have been no less at the end of 1965.

■ C. Accordingly, from a comparison of the two economic interests present here—an investment interest of approximately $395,000 and a business interest of slightly more than $180,000—it is obvious where plaintiff's allegiance had to lie. His investment interest was dominant; hence, the motivation for his loans could not have been otherwise. This says nothing, of course, about any non-economic concerns that may also have prompted plaintiff to attempt to maintain the viability of the radio corporation. To the extent such concerns may have existed—for example, a desire to see the radio corporation succeed for his son's sake—it would only further reinforce the conclusion that his loans were not predominantly motivated by his business interest.

D. As a final stand against all that has been said here, plaintiff points to a number of cases which are cited as authority for the proposition that loans extended in the interests of ensuring the continued existence of an important business customer or of preserving an essential business source of supply are viewed as business bad debts upon their later uncollectibility. It is argued that the same result must prevail here as well. We think not.

The referenced cases need not be cited for it suffices to say of them all that, to the extent their results encroach upon the outcome determined here, they do no more than demonstrate the status of the tax law prior to the *Generes* decision. But, after *Generes,* there is no room for an argument that would permit a business bad debt deduction for a loan which, at the time it was made, was equally beneficial to a co-existing and dominant non-business interest.

By the test spelled out in *Generes,* the dominant motivation for the loans in this case was the protection of plaintiff's investment interest in Rockland Radio Corporation and the avoidance of those liabilities that would devolve upon him in consequence of that corporation's demise. The business interest was secondary.

## CONCLUSION

Plaintiff is not entitled to any recovery and his petition should be dismissed.

## FINDINGS OF FACT

1. Plaintiffs, Arthur L. Winn, Jr. and Sadie N. Winn, are husband and wife, citizens of the United States of America and the State of Maryland, residing at 3298 Gleneagles Drive, Silver Spring, Maryland 20906.

2. This is an action under the Internal Revenue Code of 1954 against the United States of America for the refund of federal income taxes assessed against and collected from plaintiffs for the calendar years 1972, 1973, 1974 and 1975.

3. Plaintiffs filed timely joint federal income tax returns for the calendar years 1972, 1973, 1974 and 1975, reporting tax liabilities (including self-employment tax) of $1,390.94, $21,795.75, $31,054.33 and $16,818.40 respectively. The liabilities so reported for 1973, 1974 and 1975 were timely paid. The amount of $1,307 was paid on September 2, 1974 with respect to calendar year 1972.

4. Plaintiffs subsequently filed amended joint returns on Forms 1040X for the calendar years 1972, 1973, 1974 and 1975, claiming refunds of $715.94, $20,927.75, $30,011.83 and $15,704.50. These claims for refund were based on loss carry-backs attributed to a 1975 business bad debt due from Rockland Radio Corporation.

5. By letter dated August 3, 1979, the Commissioner notified plaintiffs by certified mail of the rejection and disallowance of the foregoing claims for refund for the calendar years 1972, 1973, 1974 and 1975.

6. Arthur L. Winn, Jr. (variously referred to herein as "plaintiff", "Arthur

Winn" or "Mr. Winn"), is a lawyer who has been engaged in the private practice of law in Washington, D.C. for 50 years. From 1939 through 1975, at least 90 percent of the Winns' income derived from Mr. Winn's law practice. During those same years, Mr. Winn was also involved in certain commercial real estate transactions.

7. Mr. Winn's first exposure to commercial real estate development occurred in 1939 when, at that time, he became involved, not as a principal (at least not initially) but as a lawyer, in the development and construction of the Longfellow Building—a 250,000 square foot twelve-story office building located in Washington, D.C.

8. As Mr. Winn explained it, his participation in the Longfellow Building venture involved more than the rendition of legal services. He became involved, for example, in raising money to get options to purchase the land on which the building was to be built; he was involved in locating an architect to design the building and he also had a hand in finding a contractor for the building's construction. Additionally, Mr. Winn was a source for some of the capital necessary to acquire the properties for the building site. However, these monies (identified by the witness as "some $3,000 to $5,000") were refunded to him when the building was completed and permanent financing was in place.

9. Mr. Winn's involvement in the problems of site acquisition and construction of the Longfellow Building spanned a period of two years, 1939–40. As compensation for these services (and also for his concurrent legal services) he received (in October 1940) 100 shares of stock in the resulting corporation—the Longfellow Building Corporation. Additionally, he was named secretary of the corporation and was also appointed to its board of directors.

10. Mr. Winn served as the corporation's secretary and on its board of directors for a period of 24 years. Through his service in these two offices, he participated in the management decisions of the Longfellow Building and for these services, he was paid a salary. That salary amounted to $3,300 in

1963 and $2,250 in 1964. (Salary information for the earlier years is not in the record.)

11. The Longfellow Building Corporation was sold in 1964. In his Federal Income Tax Return for that year, Mr. Winn reported a long-term gain (from the sale of his stock in the corporation) of $130,800. The stock is shown in the return as having had a basis of $4,500.

12. Mr. Winn's second exposure to commercial real estate occurred in 1959. In July of that year, he, together with his wife, purchased a two-story brick structure in Silver Spring, Maryland. This property, which had formerly been a residence, was remodeled by them and then rented to two commercial tenants. The property was sold by the Winns in December 1966. The selling price was $54,000; the gain on the sale was $28,102.57.

13. The Winns' next real estate venture grew out of their son Anthony's experience in the radio broadcasting business and his interest in starting (with the financial aid of his father) his own radio station. Based on a market study which he had undertaken, Anthony Winn had concluded that, because of its proximity to New York City and its foreseeable development as a new suburban growth area, Rockland County, New York, represented a prime location for the licensing of a new radio station.

14. Anthony Winn persuaded his father to investigate the Rockland County area with a view to purchasing property for the location of a radio station. Mr. Winn, already familiar with certain areas of New York State through his transportation law practice—and therefore generally aware of the area's commercial attractiveness—made a survey trip to the locale which his son had identified, namely, the town of Spring Valley (and its environs) in Rockland County, New York.

15. Though, as indicated, Mr. Winn had been caused to focus upon Rockland County because of its market potential for a radio station, first-hand investigation soon convinced him that, in addition to its desirabili-

ty as a situs for a new radio station, that area also held out much promise for the acquisition and development of commercial real estate in general.

16. Convinced that Rockland County was but a step away from becoming an area of rapid population growth, Mr. Winn purchased a three-acre parcel of unimproved commercial property on the north side of Route 59 in Nanuet, Rockland County on January 12, 1961. This property, purchased from George D. Fee for $27,000, is herein referred to either as the "Fee property" or the "Fee tract".

17. Sometime prior to his purchase of the Fee property, Arthur Winn and his son Anthony had formed a partnership known as Rockland Broadcasters. On November 3, 1960, this partnership filed an application with the Federal Communications Commission ("FCC") seeking a license to construct and operate a radio station in Nanuet, Rockland County, New York. A financial statement in support of the license application was filed with the FCC on April 15, 1961.

18. Upon advice of counsel that it would improve the prospects of obtaining a license, plaintiff and Anthony decided to include community representatives in their application. Rockland Radio Corporation (hereinafter also referred to as "RRC" or "the corporation") was formed as a vehicle for local participation on May 19, 1961, under the stock corporation law of the State of New York.

19. Under its charter, Rockland Radio Corporation was authorized to issue a total of 240 shares of no-par common stock. These shares were allocated as follows: Anthony Winn—120 shares; Arthur Winn—60 shares; Jay Northrup (a Spring Valley banker)—30 shares; Jacob Pesner (City Attorney for Spring Valley)—30 shares. The subscription price of the stock ($100) was paid in November—December 1964 and January 1965, i.e., after the FCC had granted the corporation a license to operate a radio station.

20. During the period 1960 through 1968, Anthony lacked sufficient financial capability or borrowing ability to meet the FCC's requirement that applicants for a license have adequate financial resources.

21. Plaintiff gave Anthony $12,000 to enable him to purchase 50 percent of the corporation's stock. It was plaintiff's belief that this advance was a loan. There is no evidence in the record that plaintiff received a promissory note in exchange therefor.

22. The individuals named in finding 19 became the directors of Rockland Radio Corporation. In addition, Anthony Winn was elected president of the corporation, Jay Northrup and Jacob Pesner were elected vice-presidents and Arthur Winn (plaintiff herein) became the corporation's secretary and its treasurer. As secretary, plaintiff was responsible for maintaining the records of the corporation. As treasurer, he was responsible (in conjunction with Anthony) for administration of the corporation's funds.

23. Plaintiff received no salary or compensation for the services he rendered to RRC, and the corporation did not expect to compensate him until it was financially able to do so. The corporation's board of directors viewed plaintiff's uncompensated services as a contribution to RRC in addition to the capital he had contributed to acquire his capital stock.

24. On May 3, 1961, Arthur Winn leased approximately five acres adjacent to the Fee property for an initial term of 21 years. This land, herein referred to as the "Tower land", was leased by Mr. Winn for the placement of radio transmission towers. The site was selected on the basis of engineering studies which had identified the location involved as one having the correct geographic orientation for Rockland's signal transmission requirements.

25. The lease identified in finding 24 (hereinafter referred to as the "Tower land lease") was contingent upon the issuance of a radio station license to Rockland Radio Corporation. That is to say, the lease terms provided that if "the Federal Communications Commission shall not grant the appli-

cation of the Lessee for the license to construct and operate a radio station in Rockland County, then, in such event, the Lessee shall have the right and option to cancel and terminate" the lease agreement.

26. The Tower land lease provided that the Tower land could only be used to conduct a radio broadcasting operation, including the installation and operation of radio towers and radio transmitter equipment, studios, and offices; and that plaintiff could sublet the property to Rockland Radio Corporation on the conditions that (i) it was used only for this purpose, and (ii) plaintiff and Anthony continued as owners of 25 and 50 percent, respectively, of the corporation's total authorized capital stock.

27. The Tower land lease also provided that plaintiff was required to maintain general liability insurance on the Tower land at his expense and to pay all real estate taxes assessed against the property. (Real estate taxes on the property were approximately $500 annually through 1965 and $1,000 thereafter.)

28. The annual rental for each of the 21 years of the term of the Tower land lease was in the following amounts:

| Year | Rental |
|------|--------|
| 1 | $ 7,250 |
| 2 | 13,000 |
| 3 | 14,000 |
| 4 | 15,000 |
| 5–21 | 16,000 |

The lease contained an escalation clause permitting an adjustment of the rent at the end of the tenth year of the lease term.

29. In addition to the rental amounts indicated in finding 28, the lease required plaintiff to deposit, on May 1, 1962, or 90 days following the granting of a license by the FCC, the amount of $13,000 to secure performance of the lease.

30. The Tower land lease further provided that, if the FCC license application were to be denied, then all amounts paid as rent would remain the property of the lessor as liquidated damages and as rent for the unexpired portion of the lease term.

31. The minutes of the directors' meeting of May 25, 1961 (of Rockland Radio Corporation) identify "the 5-acre plot under lease [the Tower land] and one-third of an acre of the [Fee] property owned by Arthur Winn [as being] the land occupied by the towers and ground system described in the application to the Federal Communications Commission of Arthur Winn and Anthony Winn, as amended May 2, 1961 * * *."

32. Concerning the foregoing property, the minutes go on to say: "Arthur Winn stated his willingness to assign this lease to the Corporation, without payment therefor, or to sublet the 5 leased acres at the same rental which he has obligated himself to pay, and to enter into a long-term lease for the additional one-third acre owned by Mr. Winn for approximately $1,000 annually. The Board accepted Arthur Winn's commitment."

33. Following the May 25th directors' meeting and in consequence of a resolution adopted at that meeting, the FCC license application was amended on June 6, 1961 to substitute Rockland Radio Corporation in place of Rockland Broadcasters (the partnership).

34. On May 26, 1961, plaintiff purchased a five-acre parcel of property on the north side of Route 59 in Nanuet, Rockland County, New York, approximately 200 yards west of the Fee property. On or about January 1, 1963, plaintiff purchased two acres of land adjacent to the five-acre parcel. (These parcels are collectively referred to as the "Stark Tract".) The Stark tract cost plaintiff $130,000.

35. The Fee tract was separated from Route 59 by a 30-foot strip of land partially dedicated to public use. On August 29, 1962, the Department of Public Works of the State of New York issued plaintiff a permit to build a driveway and access road from the Fee property to Route 59.

36. Plaintiff commenced construction of the driveway referred to in finding 35, in October 1962, but ceased construction when asked by a neighboring landowner to do so. Construction of the driveway, and land clearing and grading operations, resumed in

October 1964. On December 1, 1964, the neighboring landowner (Ruth Kent) initiated a lawsuit against plaintiff seeking damages for trespass and an injunction against further development of the driveway and access road. Plaintiff was ultimately successful in this litigation.

37. The hearings before the FCC on Rockland Radio Corporation's application for a license to construct and operate a radio station, and on the competing applications of Rockland Broadcasters, Inc., and Rockland Broadcasting Company, began May 7, 1962, and concluded April 1, 1963. An initial decision of the Board of Review awarding the license to Rockland Radio Corporation was made on February 17, 1964. The corporation paid $3,000 to Rockland Broadcasters, Inc., to resolve the latter's opposition to the licensing decision. Plaintiff made the payment on behalf of Rockland Radio Corporation and received in exchange therefor a promissory note.

38. On September 17, 1964, the decision of the Board of Review awarding the license to Rockland Radio Corporation became final and effective after the FCC denied the final application for appeal of the decision. At that time, RRC was authorized to proceed with construction of the radio station.

39. The cost of the legal services attributable to the acquisition of the FCC license was $33,431.38. Plaintiff and Anthony prepared the draft of the findings of fact and conclusions of law which served as the basis of the final submission of RRC's counsel to the FCC. The draft submission, which was prepared by plaintiff and Anthony over a period of several weeks, reduced by thousands of dollars the legal fees that would otherwise have been incurred by the corporation.

40. The clearing and grading of both the Fee tract and the Tower land commenced after the decision of the Board of Review of the FCC became final and effective on September 17, 1964. The board of directors of Rockland Radio Corporation decided that it would be advantageous if this work were done on both parcels of property at the same time.

41. Rockland Radio Corporation purchased its tower, studio, and transmitter equipment from Gates Radio Corporation in 1964 for the sum of $64,462.16. Approximately $22,000 of this amount was paid in cash, the balance was due under installment payments personally guaranteed by plaintiff and Anthony.

42. As had initially been discussed and agreed to at the directors' meeting of May 25, 1961 (finding 32), on June 18, 1965, plaintiff subleased and leased, respectively, the Tower land and two-thirds of an acre of the adjacent Fee tract to Rockland Radio Corporation for a term of 18 years at an annual rent of $18,134. Pursuant to this combined sublease and lease (herein the "Tower land sublease"), rent for the year February 1, 1964 through January 31, 1965 was to be paid by the corporation on or before January 1, 1969. The Tower land sublease incorporated by reference the terms of the Tower land lease.

43. At the May 25, 1961 directors' meeting (finding 32), Arthur Winn had indicated that he would (i) assign the Tower land lease to the corporation (or sublet to it the five acres involved) at the same rental he was obligated to pay and (ii) lease one-third of an acre of the Fee property to the corporation for approximately $1,000. The Tower land sublease which the parties executed on June 10, 1965 (finding 42) appears to reflect the same pricing format, *i.e.,* the annual rental charge that it contemplates ($18,134) can be taken to be the sum of the rent due under the base lease ($16,000) plus a charge of $1,000 for each one-third acre of adjoining Fee property.

44. Although the Tower land lease, by its terms, permitted the lessee's assignment of the lease, it specified that, "notwithstanding any such assignment, the Lessee shall remain liable for the payment of the rent." Thus, as lessee, Arthur Winn remained the party responsible for the payment of the rent whether or not collected from his sublessee, namely, Rockland Radio Corporation.

**96**

45. The Tower land lease also provided that, in the event of default, the lessee (Arthur Winn) would remain liable to the lessor for any difference between the lease's original rent and the rent that might be received upon the lessor's reletting of the demised premises.

46. The Fee property was not suitable for location of the radio towers since it did not have the necessary orientation and dimensions.

47. During the course of the administrative proceedings in this case, plaintiff described the significance of the Tower land, and the adjacent two-thirds acre of Fee tract, as follows:

I should emphasize that the full 5⅔ acres occupied by the towers and electrical ground system of Rockland Radio Corporation are essential to its broadcasting operations. In other words, should either the 5-acre [Tower] property be lost through termination of the lease or the [Fee] property be lost through foreclosure, the radio station could not continue to operate. Furthermore, *this is the only available land in Rockland County* on which the station can meet the exacting and highly technical radio engineering requirements of the Federal Communications Commission and continue to operate. Without this particular land, the FCC license held by Rockland Radio Corporation would be both *useless and worthless.* [Emphasis in original.]

48. After the tentative favorable decision of the FCC in February 1964, plaintiff had hired an architect to design a building that would fit the radio station's "unique" needs. The architect completed the specifications and drawings for this facility (referred to as "Broadcast House") in April 1965. A building permit was obtained in the summer of 1965, and a construction contract was awarded in the fall of 1965. Construction of Broadcast House was completed in the summer of 1966.

49. After the corporation had obtained the FCC license, plaintiff obtained from the corporation a commitment to rent the second floor of the building to be constructed on the Fee tract, *i.e.,* Broadcast House.

50. The transmitter had to be located at the site of the radio towers. The studio, on the other hand, could have been located either at the tower site or in Spring Valley, New York.

51. Prior to the construction of Broadcast House, the corporation decided as a cost-saving measure, to locate both the transmitter and the studio on the second floor of Broadcast House, rather than to house each in a separate facility.

52. Broadcast House was a small two-story building of steel and concrete construction. It contained 8,000 square feet, plus a separate garage building. It was an odd-shaped building—curved in front and coming to a point in the back—which resembled a fourth of a piece of pie. The only doors and windows on the first floor were on the front facade; there were no rear or side doors or windows.

53. Broadcast House was specially designed and constructed as a radio broadcasting facility. The building was planned for dramatic effect and as a "showpiece" to attract public attention. This required a sacrifice of those features which would have given the building commercial utility as a general purpose office or retail building. Plaintiff testified that "it was not the best kind of building for the general market."

54. The total cost of the construction of Broadcast House was $224,150. On June 18, 1965, plaintiff obtained a combined construction and permanent loan in the amount of $175,000 from The County Trust Company, Tarrytown, New York, to cover the cost of construction. The loan was evidenced by a demand note bearing interest of 6 percent. It was secured by a mortgage on Broadcast House and by the lease from plaintiff to Rockland Radio Corporation of the second floor of Broadcast House, together with rents due thereunder. Plaintiff paid interest of $10,278.18 on this loan in 1967. Arthur Winn obtained a second loan of $50,000 from an insurance company in Pennsylvania, secured by a mortgage on

his personal residence in Brinklow, Maryland, to cover the balance of the construction costs.

55. Broadcast House was located about 300 or 400 feet back from Route 59. At the time Broadcast House was being constructed, Arthur L. Winn anticipated that, under local zoning law, further development of the Fee tract (*i.e.*, the forward portion) would yield an additional 17,000—22,000 square feet of commercial space. Arthur L. Winn intended to further develop the Fee tract after Broadcast House was successfully in operation.

56. At the time Broadcast House was being constructed, plaintiff expected rental income to exceed expenses and debt service by $7,700 a year provided: (i) he received an annual rental of $18,500 for the second floor, and, (ii) the first floor were rented for $17,500. His income and cash flow projections were as follows:

$36,000 annual rental

| debt service on $175,000 mortgage | $15,057 |
| real estate taxes | 10,000 |
| insurance | 1,000 |
| maintenance and repairs | 1,500 |
| vacancy allowance | 750 |

$28,307 expenses and debt service

$ 7,693 annual net cash flow

57. On June 18, 1965, plaintiff leased to RRC the second floor of Broadcast House, and the adjacent garage building, for a term of 17 years at an annual rental of $18,500. The lease term commenced upon actual occupancy (but not later than January 1966), and ended April 30, 1982. The first installment of rent was due September 1, 1965.

58. The first floor of Broadcast House was available for renting when construction was completed in the summer of 1966. However, despite efforts to locate a tenant, it remained vacant and unrented until the last quarter of 1968 when the space was finally leased to a restaurant for $15,000 a year. The first rental payments under this lease were made in 1969.

59. In 1964–65 it was anticipated that Rockland Radio Corporation would be on a "break-even" basis within three months after the beginning of broadcasting operations. The corporation's financing was based upon this expectation.

60. As noted in finding 19, the corporation's stock had been sold to the four initial subscribers for a total of $24,000. In addition, on January 18, 1965, Rockland Radio Corporation had entered into a credit agreement with Bankers Trust Company authorizing a borrowing of $75,000. Repayment was jointly and severally guaranteed by plaintiff and Anthony Winn. Also, on May 25, 1961, Arthur Winn had agreed to loan Rockland Radio Corporation, if necessary, $46,000. Thus, in 1964–65, the corporation had on hand or available to it, funds totaling $145,000, *i.e.*, $24,000 of paid-in capital and $121,000 in assured financing.

61. The credit agreement with Bankers Trust Company referred to in finding 60 prohibited Rockland Radio Corporation from: (i) borrowing money from anyone other than Bankers Trust or plaintiff without prior written consent from Bankers Trust, and (ii) discharging any outstanding indebtedness (or indebtedness incurred in the future to plaintiff) except deferred equipment payments not in excess of $50,-000 to suppliers of transmission equipment and legal fees and expenses in the amount of $33,431.38 to Fly, Shuebruk, Blume and Gaguine.

62. Pursuant to his earlier commitment to the corporation, Arthur Winn advanced funds to Rockland Radio Corporation during 1964 in the total of $36,326. These loans, represented by notes maturing in three years and bearing interest at 6 percent, were as follows:

| May 1, 1964 | $3,000.00 |
| October 13, 1964 | 6,626.49 |
| October 17, 1964 | 2,000.00 |
| November 3, 1964 | 10,000.00 |
| December 31, 1964 | 700.00 |
| December 31, 1964 | 14,000.00 |

63. In 1965, when construction of the corporation's broadcasting facilities was nearing completion, Bankers Trust disbursed to Rockland Radio Corporation the $75,000 loan that had previously been arranged. This loan bore interest at 6 percent; repayment was due by 1970.

64. The corporation began broadcasting operations as Station WRRC in September 1965. The studio was temporarily located in an old dwelling on the Stark tract pending completion of the construction of Broadcast House. Broadcast House was completed in summer 1966 and Rockland Radio Corporation took occupancy at that time.

65. Based on ground conductivity data provided by the FCC, Rockland Radio Corporation's radio antenna system had been designed to provide broadcast reception throughout Rockland County, New York. However, almost immediately after the beginning of operations in September 1965, it was discovered that actual conductivity was substantially lower than expected and that a poor or inadequate signal was being provided to certain parts of the county.

66. The competing radio station in Rockland County, which had been on the air one year prior to the start of WRRC's own operations, circulated statements and charges throughout the business community to the effect that WRRC's broadcast signal could not be heard in important parts of the county. A pamphlet containing such allegations, entitled "Caveat Emptor", was widely distributed by this competing station.

67. Anthony Winn had projected that revenues of the station would equal expenses and cash requirements within three months after broadcasting commenced. However, the signal difficulty caused cancellations of advertising contracts and made additional sales difficult. As a result, Rockland Radio Corporation did not achieve its anticipated break-even point within the projected time-span; rather, it continued to experience operating losses.

68. As a result of the decreased coverage of the WRRC broadcast signal and its adverse impact on the station's business, revenues of WRRC were far less than anticipated. Rockland Radio Corporation operated at a loss through 1965 and 1966.

69. Rockland Radio Corporation took immediate steps to rectify the problem of its signal coverage.

70. The radio engineers retained by Rockland Radio Corporation developed a different broadcast pattern which would expand the coverage signal of WRRC to most of Rockland County, New York.

71. The FCC authorized this change in broadcast pattern in March 1966.

72. Notwithstanding implementation of the change in broadcast pattern, Rockland Radio Corporation continued to lose money through 1966 and 1967.

73. In January 1968, in an effort to reverse Rockland Radio Corporation's fortunes, the broadcast format was changed, the call letters were changed, and a new sales manager was employed. The changes turned out to be unsuccessful, and Rockland Radio Corporation continued to incur operating losses.

74. Because of the company's financial difficulties and its inability to obtain needed capital from other sources, Arthur Winn made unsecured loans to the corporation in the following amounts in the years indicated.

| Year | Amount |
|------|--------|
| 1965 | $ 15,000 |
| 1966 | $ 99,500 |
| 1967 | $ 72,575 |

75. The advancements by Arthur L. Winn to Rockland Radio Corporation were evidenced by notes either payable on demand or having a maturity from one to three years, and bearing interest at 6 percent. These notes were as follows:

| | Date | Amount |
|------|------|--------|
| 1965: | December 1 | $ 5,000 |
| | December 31 | 10,000 |
| 1966: | January 28 | 10,000 |
| | February 21 | 10,000 |
| | March 23 | 20,000 |
| | May 12 | 10,000 |

| Date | Amount |
|------|--------|
| **1966:** June 24 | $10,000 |
| July 29 | 10,000 |
| August 19 | 5,000 |
| September 1 | 5,000 |
| September 16 | 10,000 |
| October 5 | 4,500 |
| December 20 | 5,000 |
| **1967:** January 6 | 2,000 |
| January 28 | 5,000 |
| March 3 | 2,000 |
| March 31 | 6,000 |
| April 14 | 3,500 |
| May 5 | 4,000 |
| May 29 | 4,000 |
| June 7 | 5,000 |
| June 22 | 5,000 |
| July 17 | 3,000 |
| July 20 | 6,750 |
| August 22 | 3,000 |
| September 11 | 5,500 |
| September 25 | 1,500 |
| September 27 | 325 |
| October 6 | 3,000 |
| November 17 | 3,000 |
| December 7 | 2,500 |
| December 14 | 5,000 |
| December 26 | 2,500 |

76. From January 1968 through July 1970, Arthur L. Winn advanced additional funds to Rockland Radio Corporation. These advancements, involving amounts of $5,000, $455, and $372, were evidenced by notes dated January 10, 1968, June 25, 1968, and September 5, 1968, respectively; they bore interest at 6 percent and were payable on demand. Other funds advanced by Arthur L. Winn during 1968 to 1970 were ultimately repaid out of funds received by Rockland Radio Corporation as contributions to capital.

77. Other than Arthur Winn, no other shareholder of Rockland Radio Corporation made any advancements to the corporation. Arthur Winn's loans to the corporation amounted to $229,228.

78. The advancements by Arthur Winn to Rockland Radio Corporation were reflected as debt of Rockland Radio Corporation on its audited, certified, financial statements. The advancements were all unsecured and no interest or principal was ever paid thereon.

79. The funds which Arthur Winn advanced to Rockland Radio Corporation during the years 1964–70 came from various sources including: (i) earnings from his law practice, (ii) gain from the sale of his commercial property in Silver Spring, Maryland, and, (iii) borrowings from Bankers Trust Company, Tappan Zee Small Investment Corporation and personal friends and relatives.

80. At trial, Mr. Winn explained that his purpose in loaning money to Rockland Radio Corporation was not to protect his investment in the corporation but rather to protect himself against the possible loss of his other holdings, *i.e.,* his ownership in the Fee tract, the Stark tract and Broadcast House. His testimony put it this way:

> I had to protect that real estate business because I had everything in the world that I owned involved in its viability, success, and if the radio corporation couldn't pay the rent [on Broadcast House and the Tower land] and couldn't succeed, the whole thing was going to collapse and Bankers Trust in New York, I feared, would just close down and sell all of my property on the courthouse steps for one fourth of what it was worth.

81. In further explanation of the economic "tie-in" between his commercial real estate holdings and Rockland Radio Corporation, Mr. Winn stated that Broadcast House had been built, not with an eye to the general real estate market but, rather, to meet particular engineering design and situs requirements of the radio station. And because of these special characteristics, "[i]t was not the best kind of building for the general market." Indeed, as he went on to explain, "I had been having trouble renting the first floor" because the building did not offer generally desirable commercial space.

82. Even as Broadcast House was in a real sense a property of limited commercial attractiveness, so also was this true with the Tower Land lease. Though the lease on that property was assignable, the property

itself could not be used for purposes other than radio antennas. Even, however, if that use-restriction could have been avoided upon reletting, the property would have remained unattractive to a commercial tenant (other than one in the radio business) because it was land-locked, *i.e.*, without any direct access to street or highway except over adjoining property.

83. Rockland Radio Corporation could probably not have sold its radio station had it been forced to cease operations in 1966 or 1967.

84. When Arthur L. Winn made the loans to Rockland Radio Corporation he anticipated that, after the radio station had been on the air for three years and was breaking even, it would be possible to sell the radio station at a price adequate to assure repayment of his loans.

85. Rockland Radio Corporation's financial problems finally forced it to close down its broadcasting operations on August 14, 1970. Thereafter, it was actively engaged in endeavoring to sell its business, including the broadcasting license. Such a sale was ultimately made in 1971.

86. Rockland Radio sold its business, including all of its equipment, assets and broadcasting license, to WKQW Radio, Inc. ("WKQW") in 1971. Thereafter, Rockland Radio's only asset was a $225,000 unsecured purchase money note given to it by WKQW.

87. The purchase agreement between WRRC and WKQW Radio, Inc., granted plaintiff an option to purchase, for $39,000, 26 shares of the authorized stock of the buyer during the four-year period beginning March 27, 1971.

88. On October 1, 1970, plaintiff had leased a large part of the second floor of Broadcast House to Dr. George S. Staynor for $15,000 annual rent. Dr. Staynor remodeled the area for medical offices. However, a portion of the second floor was reserved for operations of station WRRC by then renamed WKQW. Dr. Staynor was also a stockholder in WKQW.

89. Broadcast House and the Fee tract on which it was located were sold by plaintiff in 1971 to Dr. George S. Staynor for $310,000.

90. WKQW operated the radio station from August 13, 1971 until October 14, 1974.

91. On April 8, 1974, WKQW filed a petition for a reorganization under Chapter 11 of the Bankruptcy Act. On November 20, 1975, WKQW was adjudicated a bankrupt in its Chapter 11 proceeding.

92. The obligations of Rockland Radio Corporation to Arthur L. Winn became worthless in November 1975.

93. Prior to 1968, plaintiff planned to hold the Stark tract for commercial development. In 1968, plaintiff received an offer from Chrysler Realty Corporation to lease the Stark tract. The deal was aborted due to a plan proposed in 1968 by the State of New York to widen the bordering highway Route 59.

94. The Stark tract was leased, by lease dated March 12, 1969, to Nomarl of New York, Inc., a shopping center developer, for an initial rent of $19,000 per year. Under the terms of this lease, the rent was due to increase to $38,000 annually after the first year. However, Nomarl terminated the lease at the end of the first year. Subsequent efforts to lease the property have not been successful.

95. During the years 1965 through 1968, Arthur Winn made the following number of business trips to Rockland County and/or New York City: 1965—15; 1966—26; 1967—24; 1968—22. These trips were undertaken mainly for the purpose of pursuing matters concerned with Mr. Winn's real estate holdings; he spent little time, perhaps no more than one hour per trip, in checking on matters involving the radio station.

96. Aside from the roughly two trips per month that Mr. Winn undertook in connection with his real estate holdings, the remainder of his time was devoted exclusively to his law practice. Thus, the law practice was not only his principal obligation timewise but also was his chief source of income.

97. Arthur L. and Sadie Winn have two children, Anthony Winn and Deirdre Niemann.

98. Arthur L. and Sadie Winn have always treated their two children equally. Neither child has received large gifts from Arthur and/or Sadie Winn.

99. Arthur L. Winn has never made a loan to his daughter, Deirdre Niemann, or to any business in which she or her husband has been involved.

100. Aside from Rockland Radio Corporation, Arthur and Sadie Winn have never made a loan to Anthony Winn or any corporation in which Anthony Winn was involved.

101. Plaintiff's income from the practice of law, as reported on the Schedule C— Business Income included in his federal income tax returns, was in the following amounts in the years indicated:

| Year | Amount |
|------|--------|
| 1963 | $71,193.70 |
| 1964 | 76,337.21 |
| 1965 | 69,488.92 |
| 1966 | 76,015.40 |
| 1967 | 65,937.59 |

102. Plaintiff reported on his federal income tax returns as "rental income from real estate" the following amounts for the years indicated:

| Year | Amount |
|------|--------|
| 1963 | $ 3,999.80 |
| 1964 | 3,934.00 |
| 1965 | 18,560.95 |
| 1966 | 3,781.74 |
| 1967 | 1,641.67 |

103. Plaintiff listed his occupation as "lawyer, real estate" or "lawyer & real estate" on his 1964, 1965 and 1966 federal income tax returns.

104. The Internal Revenue Service made an assessment against plaintiff of $14,589.06 for withholding taxes unpaid by Rockland Radio Corporation. Plaintiff paid this assessment at the rate of $1,000 per month.

105. Plaintiff filed a voluntary petition in bankruptcy on December 26, 1976.